UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CASE NO. 5:13-cv-00077-DCR

LAYTON REGISTER                                                        PLAINTIFF

V.

THE NATURE CONSERVANCY                                          DEFENDANT

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Comes the Plaintiff, Layton Register, by counsel, and hereby tenders his Memorandum in Support of his Motion for Partial Summary Judgment.

**I.     INTRODUCTION**

In 2002, Layton Register made a million-dollar donation to The Nature Conservancy to support a project he cared deeply about – the creation and management of a nature preserve at a unique property in Central Kentucky representing one of the last known remnants of old growth savanna woodlands in Kentucky, which is known as Griffith Woods.  Obviously, entrusting a significant sum to the charity required Mr. Register to place his trust in The Nature Conservancy, but he had been a long-time supporter and friend of the organization and believed they would honor his intent and restriction that his gift be used to establish and support a nature preserve at Griffith Woods.  Unfortunately, however, after experiencing difficulties managing the property, internal management changes, and debt problems, The Nature Conservancy decided to sell Griffith Woods to a state agency in 2011 and diverted Mr. Register's donation to pay off unrelated land debt and its internal administrative costs.  Now, none of the proceeds of Mr.

Register's gift are being used to support Griffith Woods as he intended, and TNC has refused to return the donation. This diversion of Mr. Register's donation in violation of his clear intent entitles him to recover his donation under various legal theories. As set forth below, Mr. Register respectfully requests that the Court enter summary judgment on his claim for breach of contract, or, alternatively, on his claims of unjust enrichment, and constructive trust and order a return of his donation.

## II.   FACTUAL BACKGROUND

### A.   Background regarding Mr. Register

Mr. Register, a lifelong Kentuckian, has been interested in and dedicated to conservation in Central Kentucky for a long time. In 1987, he began making donations to the Kentucky chapter of The Nature Conservancy (the "TNC"), a worldwide charitable organization whose professed mission is land and water conservation. [Fundraising Management System Report for Layton Register, attached as Exhibit 1, p. 34.[1]] Thereafter, Mr. Register became a regular supporter of TNC, making over three hundred monetary donations to TNC totaling $1,061,846. [Exhibit 1, p. 34.] Mr. Register's support for TNC did not end with his pocketbook. One former TNC employee recalled, "Layton, you know, would roll up his sleeves and do sweat equity volunteer work on some of the projects and stuff." [Deposition of Logan McCulloch, former Director of Development for TNC, relevant pages of which are attached as Exhibit 3, p. 25.] TNC awarded Mr. Register its volunteer of the year award for his volunteer work with the organization. [Deposition of Julian Campbell, former biologist for TNC, relevant pages of which are attached as Exhibit 4, pp. 59-60.] Mr. Register was also a regular attendee to outings hosted by TNC and served as a trustee (similar to a board member) for the Kentucky chapter of TNC.

---

[1] Multiple witnesses testified that this report, often called the "FMS Report" was TNC's method of tracking interactions with and donations from donors, like Mr. Register. [*See* Deposition of Terry Cook, former State Director for TNC, relevant pages of which are attached as Exhibit 2, pp. 16-17.]

[Deposition of Jim Aldrich, current employee and former State Director for TNC, relevant pages of which are attached as Exhibit 5, pp. 30-31.]

### B.     TNC develops Mr. Register's interest in Griffith Woods

TNC's interest in conservation of a 735-acre farm in central Kentucky known as Griffith Woods has a long history.  According to a memorandum prepared by Jim Aldrich, who served as State Director of TNC's Kentucky chapter from 1988-2007, Griffith Woods "is thought to be the best and most in tact (sic) example of a bur oak, blue ash savannah in the inner Bluegrass." [Aldrich Depo., Exhibit 5, pp. 16, 118-19; State Director's Memo submitted by Jim Aldrich, attached as Exhibit 6.]  The Kentucky chapter prepared a Real Estate Project Abstract describing the significance of the Griffith Woods farm:

> The Licking River Conservation Area Design has identified the 735-acre Hamilton et al. tract as a top acquisition priority.  The tract contains approximately 170 acres of old growth savanna woodlands, and another 200 acres of younger woodlands with excellent restoration potential.  Native ground vegetation (including several patches of running buffalo clover, a globally threatened species) has survived on the tract.  The remainder of the tract is used for agricultural purposes, including grazing, haying and row crops.  The tract includes several seasonal streams as well as a permanent stream along its western boundary.  This tract represents the best opportunity to protect and restore a remnant of the Bluegrass Savanna.

[Aldrich Depo., Exhibit 5, pp. 147-51; Real Estate Project Abstract, attached as Exhibit 7, p. 1.] Dr. Julian Campbell, a conservation scientist with a doctorate in biology and former employee of TNC, had been interested in the Griffith Woods property since the late 1970s, and TNC became interested in the site in the 1990s.  [Campbell Depo., Exhibit 4, pp. 9, 23-24, 31.]  In the late 1990s, Dr. Campbell began communicating on behalf of TNC with one of the owners of the farm, Adnée Hamilton, which prompted "two or three years of back-and-forth discussion about prospects for the farm and various options for preserving all or part of it."  [Campbell Depo., Exhibit 4, p. 25-26.]

During the discussions with the Hamilton family regarding prospects for a TNC acquisition, Dr. Campbell also took several TNC supporters, including Mr. Register, to visit Griffith Woods on at least three occasions between the late 1990s and early 2002. Dr. Campbell memorialized Mr. Register's introduction to Griffith Woods in notes he authored in late February 2002: "I have been in touch with Layton for almost three years in regard to Griffith Woods, which we have visited at least three times, initially with Clay Hancock and Tolie Otto. As plans for the woods and negotiations with the owners have progressed, Layton has expressed a keen interest." [Campbell Depo., Exhibit 4, pp. 39-41, 79; Dr. Campbell's Typewritten Notes, attached as Exhibit 8.] Mr. Register likewise wrote about his interest in Griffith Woods when declining an invitation by Mr. Aldrich that he rejoin the board of trustees: "my keen interest in Griffith Woods and helping with its development are what I would like to focus on." [Aldrich Depo., Exhibit 5, pp. 97-98; Note from Layton Register to Jim Aldrich, State Director of TNC, dated March 13, 2002, attached as Exhibit 9.]

### C.      Mr. Register decides to make a donation to TNC to establish and manage a nature preserve at Griffith Woods

Around this time, Mr. Register decided he would donate money to TNC to help it achieve its goal of preserving and managing Griffith Woods. Again, Dr. Campbell memorialized his understanding of Mr. Register's intent in notes written in late February 2002:

> Layton has pledged verbally to contribute the approximate sale price of his 120 acre farm on Bryantsville Road in Bourbon Co…. [H]e expects to raise about $1-1.2 million (his purchase price 2-3 years ago was ca. 850K?). Upon advice of his financial planners, he will give us the equivalent value in appreciated stocks, rather than the farm itself.
>
> …
>
> Layton's gift is to help with acquisition and management of the ca. 745 acres Silver Lake Farm, which contains the ca. 360 acres designed as the Griffith Woods restoration site. The total sale price for the site may be about 2-2.5

4

million, but it is likely that TNC would retain only 25-50% of the farm after reselling portions to partnering agencies and perhaps conservation buyers.

Should some of Layton's gift be freed up after satisfactory resales, he is willing to have this put toward endowment for stewardship at the site. He is also very interested in being actively involved with the farm as a volunteer in the management program, and possibly as a conservation buyer (might there be tax/ethical issues to handle carefully..?). As well as restoring the woodland, he is particularly interested in the plan to develop a native wood plant nursery on the farm. [We have been scheming and dreaming about a nursery with several people, including Doug Hines, who might take early retirement from NRCS to work on it.]

[Exhibit 8, p. 2.] Dr. Campbell testified that he made these notes for TNC to memorialize Mr. Register's expressions of intent. [Campbell Depo., Exhibit 4, pp. 39-42.] On May 13, 2002, Mr. Register wrote a note to the state director, Mr. Aldrich, asking what type of pledge language TNC needed for his planned gift: "Jim, Julian wanted a pledge statement for my stock gift. Is this okay (see enclosed)? Or did you want me to sign off on something that you need to have prepared? If so, just send it to me. Thanks, Layton" [Note from Layton Register to Jim Aldrich, State Director of TNC, attached as Exhibit 10, p. 1.] Accompanying this note and in accordance with Dr. Campbell's request for a pledge letter, Mr. Register attached a second note confirming his intention to make a donation to assist with the Griffith Woods project:

I pledge to the Kentucky Chapter of the Nature Conservancy a stock gift equal to the amount of $1 million that is to be used for land acquisition. My first preference is for the purchase being negotiated for Griffith Woods. If the Nature Conservancy is unsuccessful in its pursuit of Griffith Woods, the same amount will be made available for another site to be determined.

[Deposition of Layton Register, relevant pages of which are attached as Exhibit 11, pp. 10-11; Exhibit 10, p. 2.]

### D.     Mr. Register's intent to donate kick-starts the Griffith Woods project

Mr. Register's expression of support for the Griffith Woods project was a significant milestone in TNC's ultimate ability to acquire and pursue conservation management of the

targeted conservation site.  [Aldrich Depo., Exhibit 5, p. 112.]  Thereafter, TNC began exploring

options to fully finance the purchase and conservation of Griffith Woods.  TNC approached the

University of Kentucky and proposed a partnership in managing a nature preserve[2] at Griffith

Woods.   In August 2002, UK applied for grant funding from the Kentucky Heritage Land

Conservation Fund to allow its participation, and Mr. Aldrich drafted a letter supporting the grant

on behalf of TNC.  [Deposition of Jim Aldrich, corporate representative of TNC pursuant to Fed.

Rule of Civ. P. 30(b)(6), relevant pages of which are attached as Exhibit 12, pp. 49-51; Letter

from Jim Aldrich, State Director of TNC to William Martin, Heritage Conservation Fund, dated

August 12, 2002, attached as Exhibit 13.]  Mr. Aldrich expressed TNC's commitment to assist in

conservation management efforts at the property:

> The Nature Conservancy will participate in a range of activities at the site,
> including overall conservation, restoration, research, and educational field trips.
> We will provide expertise in conservation biology and natural history, plus direct
> assistance with management (including prescribed burning as needed).   In
> addition, we will be fostering general applications and relationships of this center
> for Bluegrass woodland ecology to broader conservation problems in adjacent
> farmland, the Licking River watershed, and the region.

[Aldrich Depo., Exhibit 5, pp. 125-26; Exhibit 13.]  The University of Kentucky did not receive

approval of its grant request until January of 2003 and the funding was not made available until

the fall of 2003.  [Aldrich Corporate Depo., Exhibit 12, pp. 49-51.]  Mr. Aldrich agreed that the

conservation of Griffith Woods required several puzzle pieces to fit together – an agreement

from the owners to sell the property, a donation from Mr. Register, and a grant to UK to allow its

partnership in the property.  [Aldrich Corporate Depo., Exhibit 12, pp. 51-52.]

---

[2] There is a significant distinction between "protecting" and "managing" a targeted conservation site.  [Aldrich Corporate Depo., Exhibit 12, p. 37.]  A site can be classified as "protected" by simply placing a conservation easement on it without investing any further time or money.  [Aldrich Corporate Depo., Exhibit 12, p. 38.] Managing a property as a nature preserve, on the other hand, is a different concept that requires conservation activities on the property – which require time and money – in pursuit of conservation objectives.  [Aldrich Corporate Depo., Exhibit 12, p. 38-39.]

**E.** **Mr. Register makes donation and expresses his intent – in many ways - to restrict his gift to Griffith Woods**

The first puzzle piece to begin falling into place was Mr. Register's donation, which occurred between September 2002 and January 2003, when Mr. Register conveyed stocks and cash to TNC worth more than $1,000,000.  On September 16, 2002, Mr. Register wrote a letter to TNC and his financial advisor expressing his intent that his donation be used to establish and manage a nature preserve at Griffith Woods:

> I'd like to make now a gift to the Kentucky Chapter of the Nature Conservancy.  I would like the gift to be in the form of stocks adding up to the equivalent of $1 million.  I would prefer that the stock be sold and the proceeds go toward the establishment and management of a nature preserve in the Bluegrass region, e.g. Griffith Woods.  If the Griffith Woods project falls through, I trust that the KNC will put to use the funds in a manner that will further help protect areas in Kentucky with unique and diverse plants and animals.

[Register Depo., Exhibit 11, pp. 11-13; Note from Layton Register to Jim Aldrich, State Director of TNC, dated September 16, 2002, attached as Exhibit 14.]  Mr. Register did not consult with an attorney before writing the letter.  [Register Depo., Exhibit 11, p. 67.]

Mr. Register made his donation for Griffith Woods through three separate transactions: (1) on September 19, 2002 Mr. Register transferred stocks worth $252,490.20 to TNC; (2) on November 6, 2002 Mr. Register transferred stocks worth $253,808.70 to TNC; and (3) on January 7, 2003 Mr. Register transferred stocks worth $418,867.99 to TNC and enclosed a check in the amount of $86,000.00.  [Register Depo., Exhibit 11, pp. 9-10, 15-16; Letters from Michael Moulton, Account Manager, State Street Corporation, to Amy Saxe, Stock Gift Coordinator with TNC, dated September 19, 2002, November 6, 2002, and January 7, 2003, respectively and attached collectively as Exhibit 15.]  Each letter from Mr. Register's investment clearinghouse confirming transfer of stock or money to TNC on Mr. Register's behalf stated "[t]his represents a gift from Layton L. Register to the Nature Conservancy-Kentucky Chapter, Griffith Woods

project" or "[t]his represents a gift from Layton L. Register to the Kentucky Chapter Griffith Woods project." [Exhibit 15.]  Thus, as of January 7, 2003, Mr. Register completed a donation to TNC with an aggregate value of $1,011,166.86, and each transfer was accompanied by instructions specifically designating its proceeds to the Griffith Woods project.  [Exhibit 15.]

In addition to what he put into writing, Mr. Register also communicated his intentions orally to representatives of TNC.  TNC's policies and procedures state that it has a fiduciary, legal, and ethical duty to use donations in accordance with donor intent, which intent may be expressed in writing, verbally, or implicitly.   [Deposition of Silvia Valle, corporate representative of TNC pursuant to Fed. Rule of Civ. P. 30(b)(6), relevant pages of which are attached as Exhibit 16, pp. 66-68.]   Thus, TNC did not merely rely only upon written documentation to establish Mr. Register's intent in making his donation, and verbal communications and the circumstances surrounding the gift are significant.

Dr. Campbell was very clear that he had communications with Mr. Register regarding his donative intent.[3]  When he first spoke with Mr. Register about the gift in early 2002, Mr. Register expressed an intention that his gift be used to acquire and manage the Griffith Woods property.  [Campbell Depo., Exhibit 4, p. 41.]  Mr. Register and Dr. Campbell also foresaw and discussed the possibility that proceeds from Mr. Register's donation, if initially used to acquire the land constituting Griffith Woods, could be "freed up" in the future if TNC sold Griffith Woods to third parties, in which instance Mr. Register expressed his intent that those recovered proceeds be used to endow management at the site.[4]  [Campbell Depo., Exhibit 4, pp. 41-42.]

---

[3] TNC has conceded that Dr. Campbell had authority to communicate with Mr. Register on behalf of TNC regarding his donation.  [Deposition of Cadell Walker, corporate representative of TNC pursuant to Fed. Rule of Civ. P. 30(b)(6), relevant pages of which are attached as Exhibit 17, pp. 13-15.]

[4]  Mr. Aldrich has a similar understanding of this provision – that if TNC recouped any of Mr. Register's gift through later sales of Griffith Woods, the proceeds would be invested in stewardship at the site.  [Aldrich Depo., Exhibit 5, p. 105.]

When Mr. Register wrote his donation letter in September 2002, Dr. Campbell testified that Mr. Register's intent had not changed and "[t]here was no doubt in my mind" that Mr. Register's gift was for the purpose of purchasing and managing Griffith Woods and that he specifically intended his gift to be used at Griffith Woods as opposed to any other site. [Campbell Depo., Exhibit 4, pp. 53-54, 58-60, 158-62.]   He further understood that Mr. Register still intended that, if the proceeds of his donation were "freed up" by resales of the property, those recovered proceeds would be utilized to create an endowment for conservation management of Griffith Woods. [Campbell Depo., Exhibit 4, pp. 58-60, 158-62.]

### F.      TNC knew Mr. Register's donation was restricted to Griffith Woods

It was likewise common knowledge within TNC that Mr. Register's gift was intended to be restricted to Griffith Woods.  The then state director of TNC, Mr. Aldrich, testified "[t]here is no doubt in my mind that he did intend for the gift to be used for Griffith Woods."  [Aldrich Depo., Exhibit 5, p. 110.]   Although not directly involved in Mr. Register's gift, TNC's development director at the time the gift was made testified similarly:  "My recollection was that it was a restricted gift and that he gave it because he wanted the conservation project of Griffith Woods to be successful, which entailed, you know, buying the land and starting conservation practices there." [McCulloch Depo., Exhibit 3, p. 31.]  Notably, TNC's representatives involved with Mr. Register when he made the donation testified that Mr. Register never expressed any intent to make a sizable donation to anything other than the Griffith Woods project.  [Campbell Depo., Exhibit 4, p. 161; Aldrich Depo., Exhibit 5, p. 110.]  TNC also behaved consistently with Mr. Register's donation being restricted to Griffith Woods.

When it received the donation, TNC classified it as restricted in its internal accounting parlance and allocated it to an account for Griffith Woods.  [Deposition of Cathy Boyd, Director

of Operations of TNC, Relevant pages of which are attached as Exhibit 18, pp. 40-43.] Specifically, TNC designated the proceeds as "temporarily restricted," which is an accounting term which means "[c]ontribution is restricted by time or to a specific action or project of the organization…. *Examples*:  the funds cannot be used until the next fiscal year; the gift is designated for the Hart Prairie preserve; funds are to be used for land acquisition in the Lower Ozarks."   [TNC Financial Management Handbook, Appendix, "FASB Compliance – Donor Restrictions & Pledges," attached as Exhibit 19, p. 1.]  This definition contrasts with donations that are "unrestricted," meaning "[n]o restrictions on the use of the contribution," and with "permanently restricted," meaning gifts to an endowment that must be maintained in perpetuity without using the principal.   [Exhibit 19, p. 1.]   TNC's designation of Mr. Register's gift as temporarily restricted is entirely consistent with his restriction; the proceeds of his donation and any proceeds of re-sales of the land could be spent, but had to be expended in support of a specific project (Griffith Woods).[5]

### G.      TNC purchases Griffith Woods and partners with the University of Kentucky as planned

The second piece of the puzzle, acquisition of Griffith Woods, fell into place between November and December, 2002.   In November 2002, the then owners of Griffith Woods executed an option to allow TNC to acquire the property.  [Aldrich Corporate Depo., Exhibit 12, pp. 46-48, Option for the Purchase of Real Estate, attached as Exhibit 20.]  In December 2002, TNC Kentucky chapter and worldwide headquarters approved the Griffith Woods project, including the plan to purchase the property.  [Aldrich Depo., Exhibit 5, pp. 147-151; Aldrich

---

[5] In addition, TNC's corporate designee acknowledged that to release the restriction associated with Mr. Register's gift, TNC was required to complete a specific form, a Financial Adjustment Request along with "sufficient documentation to explain why they were requesting the adjustment."  [Valle Corporate Depo., Exhibit 16, pp. 87-88.]  Although the restrictions on Mr. Register's donation were ultimately released by TNC, it has never produced any Financial Adjustment Request or supporting documentation supporting the release.

Corporate Depo., Exhibit 12, pp. 39-40; Exhibit 7.]  Finally, by deeds executed by the owners on December 30, 2002 and January 2, 2003, TNC acquired the property known as Griffith Woods for $2,000,000.  [Aldrich Depo., Exhibit 5, pp. 154-55; Deeds dated December 30, 2002 and January 2, 2003, respectively, attached collectively as Exhibit 21.]  At the time TNC purchased the property, there were no legal protections or restrictions on future use or development of the property except for an earlier deed restriction that prohibited cutting old growth timber from the property.  [Aldrich Depo., Exhibit 5, p. 155.]

The third piece of the puzzle, participation in the project by the University of Kentucky, fell into place in 2003 and 2004.  In January 2003, the University of Kentucky received approval of the grant it sought for Griffith Woods.  [Aldrich Corporate Depo., Exhibit 12, pp. 50-51.]  On February 26, 2004, TNC sold approximately 391 acres of the Griffith Woods property to the University of Kentucky to consummate the joint venture with respect to the project.  [Deed, dated February 26, 2004, attached as Exhibit 22.]  The University of Kentucky paid TNC $1,120,000.00 for the purchase.  [Exhibit 22, p. 1.]  The University also conveyed a conservation easement to the Kentucky Heritage Land Conservation Fund restricting future development of the portion of the Griffith Woods property it purchased from TNC.  [Deed of Conservation Easement, dated February 26, 2004, attached as Exhibit 23.]

As of February 2004, all of the pieces of the Griffith Woods puzzle were in place.  TNC had accepted Mr. Register's donation for Griffith Woods, purchased the property, and entered a joint venture with the University of Kentucky to manage the property for conservation purposes.

### H.   Problematic conservation management at Griffith Woods causes TNC to sell the property to the Kentucky Department of Fish and Wildlife Resources

After the University of Kentucky purchased about half of the Griffith Woods property from TNC, the conservation efforts at the property were supposed to be managed by a

consortium of interested parties.  [Register Depo., Exhibit 11, pp. 35-37.]  Unfortunately, there were significant issues and complications with implementing management of the property. [Cook Depo., Exhibit 2, pp. 38-39; Deposition of Jeffery Sole, corporate representative of TNC pursuant to Fed. Rule of Civ. P. 30(b)(6), relevant pages of which are attached as Exhibit 24, p. 30.]  For whatever reason, the members of the consortium could not reach agreement on the proper conservation management plan for the property.  [Register Depo., Exhibit 11, p. 37.]

Meanwhile, the Kentucky chapter of TNC was undergoing significant changes.   In February 2007, TNC conducted an internal audit of the Kentucky chapter.   One of the issues identified in the audit was that the Kentucky chapter's outstanding loan balance to TNC's Land Preservation Fund (the fund state chapters borrow from to finance land acquisitions) was $6.1 million, of which $5.3 million was past due (most between 5-8 years past due).  [Aldrich Corporate Depo, Exhibit 12, pp. 72-73; 75-80; Internal Auditors' Report, as of February 2007, Exhibit 25, p. 3.]  As a result, the Kentucky chapter and TNC's worldwide office implemented a debt reduction plan that required the Kentucky chapter to repay significant land debts over the next several years.  In October of 2007, TNC removed Mr. Aldrich, who had served as the state director since 1988, from that position and made him director of stream and wetland restoration in Kentucky.[6]  [Aldrich Depo., Exhibit 5, pp. 10, 16-18.]  In September of 2008, TNC named Terry Cook as the new Kentucky state director.  [Cook Depo., Exhibit 2, p. 9.]

Shortly thereafter, in a report to Mr. Register written on November 25, 2008 by the new state director and its director of philanthropy, TNC indicated that it wished to sell its remaining interest in Griffith Woods.  [Cook Depo., Exhibit 2, pp. 53-55; Report to Mr. Layton L. Register, dated November 25, 2008, attached as Exhibit 26.]   In response to this report, Mr. Register

---

[6] The Plaintiff is not suggesting that Mr. Aldrich was removed as a result of the audit.  The two issues are highlighted as changes and issues TNC's Kentucky chapter faced shortly before deciding to sell Griffith Woods.

authored an email on the same date expressing interest in the concept of centralizing ownership of Griffith Woods in a single entity with conservation expertise by donating – not selling – interests in Griffith Woods to such an entity.  [Register Depo., Exhibit 11, pp. 37-41; Signed memorandum, attached as Exhibit 27.]  TNC took no action on the suggestion and the project stalled.

Two years later, in 2010, TNC was approached by the Kentucky Department of Fish and Wildlife Resources ("KDFWR") about purchasing TNC's interest in Griffith Woods.  [Cook Depo., Exhibit 2, p. 63.]  On June 10, 2010, TNC's board approved a sale of Griffith Woods to the KDFWR.  [Cook Depo., Exhibit 2, pp. 77-79.]  The sale closed a year later on October 17, 2011, when TNC sold its entire interest in the Griffith Woods property to KDFWR in exchange for $1,380,760.00.  [Cook Depo., Exhibit 2, pp. 34-37; Deed, dated October 17, 2011, attached as Exhibit 28.]  TNC has admitted that it placed no conservation easement on the property prior to the sale to KDFWR.  [Cook Depo., Exhibit 2, p. 37.]  Moreover, TNC did not disclose any of the material terms of the sale to Mr. Register; it never told Mr. Register the price it would receive for the sale, whether there were any conservation easements or other restrictions being placed on the property as part of the sale, how TNC intended to use the proceeds from the sale, or how Griffith Woods would be managed after the sale.  [Walker Corporate Depo., Exhibit 17, pp. 76-77.]

## I.     None of the proceeds from re-sales have been used for management at Griffith Woods

TNC has engaged in two "re-sales" of the Griffith Woods property.  The first, to the University of Kentucky in 2004, yielded $1,120,000.00, and the second, to KDFWR in 2011, yielded $1,380,760.00.   [Boyd Depo., Exhibit 18, pp. 82-83.]   Thus, TNC invested $2,000,000.00 in the property in 2002 and realized a $500,760.00 gain through subsequent sales

of the property, which recovered more than the full value of Mr. Register's gift. [Boyd Depo., Exhibit 18, 82-84.]

Although TNC recovered the entirety (and more) of Mr. Register's donation when it sold the property in 2011, it did not use these proceeds for conservation purposes at Griffith Woods as Mr. Register intended. Specifically, Cathy Boyd, Director of Operations for TNC, explained that, when Mr. Register made his donations of stock and cash, TNC allocated the proceeds of Mr. Register's donations to an account used to fund the purchase of Griffith Woods and the proceeds were, in fact, used to effect the purchase. [Boyd Depo., Exhibit 18, pp. 114-15.] Upon re-sales of Griffith Woods to the University of Kentucky in 2004 and the KDFWR in 2011, TNC re-deposited the re-sale proceeds back into the exact same account. [Boyd Depo., Exhibit 18, p. 115-16.] After these re-sales, however, TNC transferred these proceeds from the account designated for Griffith Woods to pay off internal land debt associated with a wholly separate conservation project (the Davis Bend project) and to its general operating fund, which is not restricted in any way to use at Griffith Woods. [Boyd Depo., Exhibit 18, pp. 116-17.] Although TNC claims that it has continued to expend some funds for management support at Griffith Woods, it admits that it cannot present any evidence that the recovered proceeds of Mr. Register's donation are being used for this purpose. [Boyd Depo., Exhibit 18, pp. 120-21.] In fact, in an accounting provided to Mr. Register only after he questioned TNC's use of the proceeds and why there was not funding for management at the site after the re-sale to KDFWR, TNC disclosed that it spent the proceeds on several operational needs unrelated to Griffith Woods. [Cook Depo., Exhibit 2, pp. 87-90; Griffith Woods Sale Proceeds Report, attached as Exhibit 29.]

### J.      Mr. Register learns that his gift is no longer benefiting Griffith Woods

After TNC sold Griffith Woods to KDFWR, it did not seek Mr. Register's input on use of the proceeds of his gift recouped by the sale.  Initially, TNC represented to Mr. Register that it remained involved in management activities at Griffith Woods and that it intended to fund a conservation management position at the site.  [Email from Terry Cook to Layton Register, dated May 9, 2012, attached as Exhibit 30.]  Months later, Mr. Register grew frustrated after receiving no further communication regarding TNC's activities at the site.  [Email from Layton Register to Terry Cook, dated September 27, 2012, attached as Exhibit 31.]  TNC responded that, due to a state hiring freeze and general administrative issues, the conservation manager had not been approved or funded yet.  [Email from Terry Cook to Layton Register, dated October 1, 2012, attached as Exhibit 32.]  As his frustration grew, Mr. Register questioned TNC why the donation he'd given – now freed up by a re-sale – could not be used to support Griffith Woods:  "[w]hat about the cash I gave to purchase the land?  That's available, correct?"  [Email from Layton Register to Terry Cook, dated October 24, 2012, attached as Exhibit 33.]  Mr. Register requested a meeting to determine how TNC had utilized the proceeds of his gift, and, in November of 2012, he learned that the proceeds had been dedicated to TNC projects entirely unrelated to Griffith Woods.  [Cook Depo., Exhibit 2, pp. 87-90; Griffith Woods Sale Proceeds Report, Exhibit 29.]

On February 27, 2013, Mr. Register filed a complaint against TNC as a result of their failure to honor the restrictions he placed on his substantial gift.  In particular, Mr. Register asserted claims for breach of contract, unjust enrichment, fraud in the inducement, constructive fraud, and constructive trust.  The complaint seeks a return of the donation to Mr. Register as well as punitive damages.  [Complaint, Docket Entry No. 1-1, pp. 2-8.]

## III.    ARGUMENT

### A.    Summary Judgment Standard

"Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.,* 285 F.3d 415, 424 (6th Cir.2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986); *see Harrison v. Ash,* 539 F.3d 510, 516 (6th Cir.2008). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)." *Tackett v. Vargas*, 2014 WL 3695469 (E.D. Ky. July 24, 2014).

### B.    There is no genuine dispute that Mr. Register intended to restrict his donation to Griffith Woods

All relevant written and oral communications between the parties establish that they understood the donation was restricted to use in connection with Griffith Woods.  As a starting point, Mr. Register is unequivocal that he intended to restrict his donation to establish and manage a nature preserve at Griffith Woods.  [Register Depo., Exhibit 11, pp. 14, 23, 28.]  Every communication from Mr. Register regarding the donation mentioned Griffith Woods, and the letters accompanying Mr. Register's stock and cash gifts each specify that his donations are to be applied to the Griffith Woods project.  [Exhibits 10, 14, and 15.]  Thereafter, Mr. Register invested time and effort into the project he loved:  "Layton put a lot of personal time already,

16

you know, in the early months of the ownership, to – really did a lot of work at the farm, taking out all of the fence" and "[t]here was no questions he would pick up trash on the highway, I mean, once a week.  There was a lot of activity.  And he got the volunteer of the year award to some extent for that.  It was no question he was committed to that site."  [Campbell Depo., Exhibit 4, pp. 59-60.]

Mr. Register did not give TNC over $1,000,000.00 in a vacuum; TNC developed his interest in the property over the course of several years, he engaged in months of discussions with representatives of TNC about Griffith Woods, he wrote and had others write correspondence indicating that his donation was for the purpose of establishing and managing a nature preserve at Griffith Woods (the "Griffith Woods project"), and ultimately invested more than money in this project by volunteering his time at the site.  Mr. Register's words and actions unequivocally communicated that he was solely interested in establishing a nature preserve at Griffith Woods; it was the entire reason for his donation and his donation was plainly restricted to that project.

TNC understood Mr. Register's restriction.  Every witness who worked at TNC at the time of Mr. Register's donations acknowledged that they understood that Mr. Register intended that his gift be used solely for the Griffith Woods project.[7]  [Campbell Depo., Exhibit 4, pp. 53-54, 58-60, 158-62; Aldrich Depo., Exhibit 5, p. 110; McCulloch Depo., Exhibit 3, p. 31.] Indeed, TNC's actions were repeatedly consistent with the donation being restricted.  When it

---

[7] Since being sued for a return of Mr. Register's gift, TNC has taken multiple inconsistent positions regarding whether Mr. Register's donation was restricted as a legal matter.  In interrogatory responses, TNC initially claimed the donation was completely unrestricted because Mr. Register's letters (and its responses) did not create a restriction.  [Defendant's Answers to Interrogatories, Exhibit 34, p. 9.]  TNC's actions in classifying Mr. Register's gift as restricted belie its position on this issue.  Then, during the deposition of Mr. Aldrich, who was presented as a corporate representative speaking on behalf of TNC, he initially took the position that the gift was unrestricted and later switched the corporate position to a temporary restriction.  [Aldrich Corporate Depo., Exhibit 12, pp. 57-69.] Nevertheless, as set forth above, even Mr. Aldrich testified that he understood that Mr. Register intended his gift to be used for Griffith Woods, the true nature of the restriction.

received the donation, TNC classified it as restricted.  [Boyd Corporate Depo., Exhibit 18, pp. 40-43.]  In addition, after purchasing Griffith Woods, Mr. Aldrich, TNC's state director at the time, approached Mr. Register and requested his consent for TNC to reallocate $100,000 of his donation.  [Aldrich Depo., Exhibit 5, pp. 169-71.]  If the gift were truly unrestricted, such permission would have been unnecessary.  Finally, in 2011, when preparing to sell its interest in Griffith Woods to KDFWR, TNC's paralegal handling the sale drafted a closing checklist and testified that Daniel Guy, in-house counsel for TNC, requested that she include a requirement that TNC document a conversation with Mr. Register about sale of the property because "he gave us a large donation … [f]or the purchase of that property."  [Deposition of Dian Osborne, relevant pages of which are attached as Exhibit 35, pp. 22-23, 26-28; Closing Checklist, dated September 29, 2011, attached as Exhibit 36.]  This item remained unchecked on the closing checklist, and although TNC claims that Mr. Register consented to the sale, it has produced no evidence that he was ever informed of its complete terms and TNC's plans for the proceeds before the sale occurred.  Moreover, if the donation was unrestricted as TNC claimed in this suit, why would it have felt that it needed his consent?

Although TNC has changed its position on the restrictive nature of Mr. Register's donation in response to this lawsuit (even in the context of its responses to discovery), its actions prior to selling Griffith Woods to KDFWR belie its position and indicate that it fully understood that Mr. Register restricted his donation to establish and manage a nature preserve at Griffith Woods.

### C.   When a charitable donation is restricted by a donor to a specific purpose, it must be returned to the donor if it is not used for the purpose.

Kentucky has long held that the donor may restrict a gift to a charity to a specific purpose and, if the charity ceases using the gift for that purpose, the gift must be returned.  *Woman's*

*Hospital League v. City of Paducah*, 223 S.W. 159, 164 (1920) ("It is not intended to declare in this opinion that the mayor and commissioners of the city of Paducah have not the power sooner, and after a fair test by its use in the isolation and care of persons afflicted with contagious diseases, to determine whether the hospital in question is no longer adequate to the needs of those intended to be benefited by it, and upon so finding discontinue its use on that ground; but it would be inequitable to permit the city to do this without repaying to the Woman's Hospital League the money they contributed to the erection and equipment of the hospital; and if the city fail to make such payment it should be compelled by the judgment of a court to do so."); *McElroy v. Pope*, 154 S.W. 903, 904 (Ky. 1913) ("We have held in a number of cases that, if property is donated to a certain charity, it reverts to the donor, when the charitable use to which it is dedicated ceases."); *Grundy v. Neal*, 145 S.W. 401, 402-03 (Ky. 1912) ("While the deed contains no provision to the effect that, in the event the property shall cease to be used for the purpose for which it was granted, it shall revert to the grantor, such provision was not necessary; for, the conveyance being a voluntary one for a charitable purpose, it would automatically revert to the grantor when the purpose for which it was conveyed had failed."); *Morrow v. Slaughter*, 68 Ky. 330, 333 (1869) ("Had the appellee been the donor of a charity, a failure in the object of dedication would, by an implied trust, have resulted in a reversion to herself.").

This longstanding rule is recognized by many other jurisdictions. *Secretary of U.S. Air Force v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir. 2009) (donor could reclaim donation when donee failed to use it for restricted purposes); *Dunaway v. First Presbyterian Church of Wickenburg*, 442 P.2d 93, 96 (Ariz. 1968) ("Where a religious society raises a fund by subscription for a particular purpose, it cannot divert the fund to another purpose, and, if it abandons such purpose, the donors may reclaim their contributions."); *Stock v. Augsburg*

19

*College*, 2002 WL 555944, at *5-7 (Minn. Ct. App. Apr. 16, 2002) ("We suggest it would be startling news to Augsburg's alumni that their college's 'charitable and educational mission' includes specifically soliciting contributions for a particular purpose, formalizing that solicitation by a specific vote of the board of regents, and then claiming the power to say, 'Oops, we changed our mind.  We are not going to give your money back, instead we are going to keep it.'"); *Kinney v. Catholic Diocese of Biloxi, Inc.*, 142 So. 3d 407, 415 (Miss. 2014) (finding donors had a legally enforceable right to return of their donations once charity announced it was not going to complete the project for which their donations were given); *Barker v. Wardens and Vestrymen of St. Barnabas Church*, 126 N.W.2d 170, 177 (Neb. 1964) (plaintiff entitled to return of donation after church abandoned specific project for which donation was given and diverted the proceeds to unrelated uses); *Adler v. SAVE*, 74 A.3d 41, 43 (N.J. Super. Ct. App. Div. 2013) ("Absent the donor's consent, the recipient of the gift is not at liberty to ignore or materially modify the expressed purpose underlying the donor's decision to give, even if the conditions that existed at the time of the gift may have materially changed, making the fulfillment of the donor's condition either impossible or highly impractical. When, as here, the donor is alive and able to prove the conditional nature of the gift through his or her testimony and other corroborative evidence, a reviewing court's duty is to enforce the donor's original intent, by directing the charity to either fulfill the condition or return the gift."); *Courts v. Annie Penn Memorial Hosp., Inc.*, 431 S.E.2d 864, 866 (N.C. Ct. App. 1993) ("A person has the right to give away his or her property as he or she chooses and 'may limit a gift to a particular purpose, and render it so conditioned and dependent upon an expected state of facts that, failing that state of facts, the gift should fail with it.'"); *Tennessee Div. of United Daughters of the Confederacy v. Vanderbilt University*, 174 S.W.3d 98, 114 (Tenn. Ct. App. 2005) (failure to comply with donor-imposed

restriction on use of gift entitles donor to recover gift); *Ball v. Hall*, 274 A.2d 516, 520 (Vt. 1971) (noting that if donor restrictions on gift are not performed, the donor is entitled to restitution).  Several of these cases are closely analogous to the facts of the present dispute.

For example, in *Adler v. SAVE*, the Defendant, SAVE operated a non-profit animal shelter that offered a home, veterinary services, and adoption of stray animals.  *Adler v. SAVE*, 74 A.3d 41, 43 (N.J. Super. Ct. App. Div. 2013).  The plaintiffs, Bernard and Jeanne Adler, were animal lovers who had supported SAVE for many years.  *Id.* at 43-44.  In the early 2000s, SAVE embarked on an ambitious campaign to raise money to build a 35,000 square foot facility, which was planned to include separate living areas for stray dogs and cats and offered several opportunities for naming rights.  *Id.* at 44-47.  The plaintiffs received information about the new building, were very interested in the project, and expressed interest in the living rooms for dogs and cats.  *Id.* at 45.  The plaintiffs agreed to donate $50,000.00 to SAVE for the purpose of naming one living room for large dogs and a separate room for older cats.  *Id.* at 47.  The plaintiffs admitted they did not discuss with SAVE what would happen to their donation if the building was not constructed.  *Id.*  There was no written agreement between the parties; the plaintiffs simply proceeded to make a series of donations of cash and stock to SAVE worth $50,000.00, and received a naming opportunities form, which they did not return.  *Id.* at 47-48. In 2006, SAVE announced that it was merging with another charitable organization and would not be constructing the new facility as initially planned.  *Id.* at 49.  Instead, it planned to construct a significantly smaller facility at a different location.  *Id.*  The plaintiffs sought a return of their donation, which SAVE refused.  *Id.*  The plaintiffs filed suit.  *Id.*

The trial court found in the plaintiffs' favor and ordered full restitution, which was affirmed on appeal.  First, the courts noted that the plaintiffs clearly restricted their gift:

> the Adler's [sic] donation was motivated by a desire to provide better conditions for large dogs and older cats.  They put their money where their hearts were.  Although, all of the Ts were not crossed, and all of the Is were not dotted, it was clear … they were only making donations for these reasons.

*Id.* at 53.  Given this clear intent, the court held that the charity's actions were inequitable and required return of the gift:

> Absent the donor's consent, the recipient of the gift is not at liberty to ignore or materially modify the expressed purpose underlying the donor's decision to give, even if the conditions that existed at the time of the gift may have materially changed, making the fulfillment of the donor's condition either impossible or highly impractical. When, as here, the donor is alive and able to prove the conditional nature of the gift through his or her testimony and other corroborative evidence, a reviewing court's duty is to enforce the donor's original intent, by directing the charity to either fulfill the condition or return the gift.

*Id.* at 43.  *Adler* is strikingly similar to the present case.  In both cases, the donors expressed a requirement that their gifts be used for a specific purpose and the charities who received the donations diverted the donations to unrelated projects.

### D.     Mr. Register is entitled to summary judgment on his claim for breach of contract.

To establish a breach of contract claim, a plaintiff must prove the existence of a contract, a breach of its terms, and damages.  *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007).  A valid contract requires proof of offer and acceptance, complete terms, and consideration.  *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002).  Where a writing evidences only a portion of the parties' agreement and, by itself, is not an integrated and complete contract, courts may look to parol evidence to determine the complete terms of the agreement.  *See Kovacs v. Freeman*, 957 S.W.2d 251, 257 (Ky. 1997).

In several cases, courts have applied contract principles to permit a donor to enforce the terms of a restricted gift.   For example, in *Woman's Hospital League v. City of Paducah*, an association of women whose aim was creating better hospital conditions for care of the sick,

22

agreed to donate to the City of Paducah half of the price needed to construct a new wing at the local hospital. *Woman's Hospital League v. City of Paducah*, 223 S.W. 159, 159-60 (1920). The association restricted the donation by requiring that the city name the new hospital ward the "Ewart Purcell Isolation Ward" and devote it to use as an isolation ward for care of those with contagious diseases. *Id.* The city accepted the donation, built the ward, and began its operation. *Id.* at 160. The court noted that the understanding between the parties that the donation would be used only for an isolation ward satisfied all of the elements essential to a valid contract. *Id.* Shortly thereafter, however, the city decided to repurpose the new ward as a home for nurses – a breach of the agreed purpose of the donation. *Id.*

The woman's association sued to enjoin the city's diversion of its gift, and the Kentucky court agreed to the injunction, noting "it is well settled that, if a grant or devise is made for a specific, limited, and definite purpose, the subject of the grant cannot be used for another purpose…." *Id.* at 162 (internal quotations and citations omitted). Indeed, the court went on to state that the city could change the use of the ward from its restricted purpose, "but it would be inequitable to permit the city to do this without repaying to the Woman's Hospital League the money they contributed to the erection and equipment of the hospital; and if the city fail to make such payment it should be compelled by the judgment of a court to do so." *Id.* at 164. Thus, the terms of a restricted donation may give rise to a contract, and, if a recipient of a restricted donation wishes to abandon the purposes for which the donation was made, it may do so, but must return the donation.

Likewise, in *Tennessee Div. of United Daughters of the Confederacy v. Vanderbilt University*, the Tennessee United Daughters of the Confederacy ("UDC") raised money to build a dormitory at Peabody College, which later merged with Vanderbilt University. *Tennessee Div.*

*of United Daughters of the Confederacy v. Vanderbilt University*, 174 S.W.3d 98, 102-107 (Tenn. Ct. App. 2005).   Between 1913 and 1933, the UDC and Peabody raised money and agreed that the dormitory would be named "Confederate Memorial Hall."   *Id.* at 104-05.   Years later, in 2002, sentiments regarding possible connotations associated with the name "Confederate" caused Vanderbilt to change the name of the dormitory to "Memorial Hall."   *Id.* at 107.   The UDC sued Vanderbilt for breach of contract.   *Id.* at 109.   The Tennessee appellate court found that where a recipient of a gift fails to comply with restrictions placed on the gift, a donor is entitled to recover the gift.   *Id.* at 114.   In this case, the court found that the UDC's gift required that Vanderbilt maintain the name "Confederate Memorial Hall."   *Id.* at 116.   Because Vanderbilt changed the name of the building, the court held that the gift had to be returned and adjusted for inflation:

> As noted above, where a donee fails or ceases to comply with the conditions of a gift, the donor's remedy is limited to recovery of the gift. However, it would be inequitable to allow Vanderbilt to "return" the gift at issue here simply by paying the Tennessee U.D.C. the same sum of money the Tennessee U.D.C. donated in 1933 because the value of a dollar today is very different from the value of a dollar in 1933. To reflect the change in the buying power of the dollar, the amount Vanderbilt must pay to the Tennessee U.D.C. in order to return the gift should be based on the consumer price index published by the Bureau of Labor Statistics of the United States Department of Labor. As attested by numerous Tennessee statutes, reference to the consumer price index is the most common way to calculate a change in the value of money over time under Tennessee law

*Id.* at 119.

Like these cases, Mr. Register's donation to TNC created a valid contract that has been breached by the diversion of his donation to unauthorized purposes.   When looking at all of the parties' communications and testimony in the case, it becomes clear that TNC and Mr. Register had a meeting of the minds that he would make a substantial donation that TNC use – together with the proceeds of any re-sales generated by that donation – for the establishment and

maintenance of a nature preserve at Griffith Woods.  Mr. Register's writings (those he wrote himself and those his instructed his investment manager to write accompanying his donation) all indicate that his purpose in making the donation was to establish and manage a nature preserve at Griffith Woods.  From Mr. Register's conversations with TNC representatives, TNC was clear that Mr. Register wanted his donation – and any future proceeds recouped from resales – used solely for Griffith Woods.  From these communications, the terms of a contract are apparent: Mr. Register agreed to make a significant donation and TNC accepted the donation and agreed that it would comply with his intention that the donation and future proceeds therefrom be restricted to use at Griffith Woods.

The contract is further evidenced by the parties' actions.  Mr. Register made the donation as promised.  TNC initially accepted the donation, allocated the proceeds to a restricted fund, invested the proceeds in the Griffith Woods land, and, on one occasion, sought Mr. Register's consent before reallocating proceeds recouped from a resale.  Even after selling the property to KDFWR, TNC led Mr. Register to believe that it might still use the proceeds to benefit Griffith Woods by funding a conservation management position at the site.   The actions are fully consistent with TNC's understanding and recognition that it obligated itself to utilize the proceeds of Mr. Register's donation only for establishment and management of a nature preserve at Griffith Woods.

TNC breached the terms of the agreement.  It is undisputed that TNC has diverted the proceeds of Mr. Register's gift to fund expenditures entirely unrelated to Griffith Woods:

> **Q:**    I know, but does TNC still have any portion of Mr. Register's funds invested in Griffith Woods?
> **A:**    **I guess the answer to that would be no.**

[Aldrich Depo., Exhibit 5, p. 111.]  Instead, TNC used the proceeds of Mr. Register's donation, which it recouped upon sale of Griffith Woods to KDFWR, to pay down land debt and fund operational expenses unrelated to Griffith Woods.  [Cook Depo., Exhibit 2, pp. 87-90; Griffith Woods Sale Proceeds Report, Exhibit 29.]  Thus, the parties do not dispute that Mr. Register's donation has been diverted from Griffith Woods.  By doing so, it violated the terms of its agreement with Mr. Register.

For these reasons, Mr. Register respectfully requests that the Court enter partial summary judgment in his favor finding that he and TNC entered a valid contract and that TNC's diversion of the proceeds of his donation to unrelated projects constitutes a breach of the contract and that Mr. Register is entitled to recover the amount of his donation.

### E. Alternatively, Mr. Register is entitled to summary judgment on his claim for unjust enrichment, and the Court may impose a constructive trust on the proceeds of his donation.

Should the Court conclude that there was not a contract between the parties, it may nevertheless grant summary judgment to Mr. Register on his unjust enrichment claim and impose a constructive trust on the proceeds of his donation.  For a party to prevail under the theory of unjust enrichment, it must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value.  *Collins v. Kentucky Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. App. 2012).  In Kentucky, an unjust enrichment claim can arise from an implied contract, which is a contract imposed at equity to prevent an unjust result:

> The term "contract implied in law" is applied to a class of obligations created by law without regard to the assent of the parties upon whom the obligation is imposed-one which is not a contract obligation in the true sense, but a quasi contract, constructively imported by law, as where one has received money or its equivalent under such circumstances that in equity and in good conscience he

26

ought not to retain it, in which case the owner may recover in an action in form ex contractu.

*Union Central Life Ins. Co. v. Glasscock*, 110 S.W.2d 681, 686 (1937).   In addition, a constructive trust can arise when a party is under an equitable duty to convey property to another because he would be unjustly enriched if he retained it.  *Terrill v. Estate of Terrill*, 217 S.W.3d 858, 860 (Ky. App. 2006).  Constructive trusts are created by courts to remedy situations where one party obtains property through violation of a fiduciary relationship or in any other manner such that he should not equitably retain it.  *Keeney v. Keeney*, 223 S.W.3d 843, 849 (Ky. App. 2007).   The theory of unjust enrichment has been utilized by courts to compel restitution of restricted gifts.  *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 772 (2004)

The present facts present ideal circumstances for application of unjust enrichment and imposition of a constructive trust in the event the Court concludes there was no contract between the parties.  Mr. Register conferred a benefit on TNC by donating over $1,000,000.00 in 2002, and TNC has experienced an appreciation of the benefit by utilizing the proceeds of the donation to purchase and sell land at a significant profit.  The facts here necessitate equitable intervention because both parties understood from communications and the surrounding circumstances that Mr. Register's gift was to be restricted for use to establish and manage a nature preserve at Griffith Woods, but TNC has diverted the proceeds of Mr. Register's gift to unrelated projects and refused to return the donation.  TNC hopes to keep Mr. Register's donation without applying it to the project it admittedly knew he wanted to benefit.  Such a result would be inequitable and justifies application of the doctrine of unjust enrichment in this case.  For this reason, Mr. Register respectfully requests that the Court enter summary judgment on his claim for unjust enrichment and impose a constructive trust requiring TNC to return the proceeds of his donation.

## IV.     CONCLUSION

Mr. Register made a donation to TNC that was restricted to establishing and managing a nature preserve at Griffith Woods.  His donation is no longer serving its intended purpose and TNC did not utilize his gift as he requested and it agreed.  Therefore, Mr. Register respectfully requests that the Court enter summary judgment in his favor on his breach of contract or, alternatively, unjust enrichment claim, and order the return of his donation.

Respectfully submitted,

/s/ D. Barry Stilz
D. Barry Stilz
Robert C. "Coley" Stilz, III
Erin Fulkerson Hall
KINKEAD & STILZ, PLLC
301 E. Main Street, Suite 800
Lexington, Kentucky 40507
Telephone: (859) 296-2300
Facsimile: (859) 296-2566
ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

      I certify that a true and correct copy of the foregoing has been served via CM/ECF on this the 2nd day of September, 2014, to the following:

Ernest H. Jones, II, Esq.
Phillip M. Moloney, Esq.
333 West Vine Street, Suite 1400
Lexington, Kentucky 40507
pmoloney@sturgillturner.com


/s/ D. Barry Stilz
*Counsel for Plaintiff*