UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| LAYTON REGISTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 13-77-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| THE NATURE CONSERVANCY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is pending for consideration of Defendant The Nature Conservancy's ("TNC") motion for summary judgment on all claims and Plaintiff Layton Register's motion for partial summary judgment on his claims of breach of contract and unjust enrichment. [Record Nos. 76, 78] Register made an inter vivos charitable donation of one million dollars to TNC in 2002. He alleges that he intended the funds to be permanently restricted for the purchase and management of a parcel of land in Harrison County, Kentucky known as Griffith Woods. TNC combined an internal loan with Register's donation to purchase the property in late 2002 for approximately two million dollars.

TNC then sold the property. The first tract was sold to the University of Kentucky in 2004, a sale which had been contemplated, at least in theory, at the time of Register's donation. TNC sold the remaining tract to the Kentucky Department of Fish and Wildlife Resources ("KDFWR") in 2011. Rather than using the funds received from the sales for management of Griffith Woods, as Register alleges he intended, TNC used the proceeds for other projects. Register brought this action against TNC for: (i) breach of contract; (ii) unjust

-1-

enrichment;[1] (iii) fraud in the inducement; (iv) constructive fraud; and (v) imposition of a constructive trust over the donated funds.

For the reasons discussed below, summary judgment will be granted, in part, and denied, in part. More specifically, Register's claims of unjust enrichment, fraudulent inducement, and constructive fraud will be dismissed, but the parties' motions for summary judgment on the breach of contract claim will be denied. While Register made a restricted donation to TNC and TNC is bound to abide by that restriction or return the donation, factual issues remain regarding the specific terms of the restriction and whether TNC has complied with those restrictions.

**I.**

Register, a long-time supporter of conservation efforts in the region, developed a relationship with TNC in 1987. He supported the organization's efforts with financial donations and "sweat equity" by physically assisting with certain projects. [Record No. 78-4, p. 2] Register was given the volunteer of the year award, attended regular events and served as a Trustee for the Kentucky Chapter of TNC. [Record Nos. 78-5, pp. 14–15; 78-6, pp. 6–7] Register made over three hundred monetary donations to TNC, totaling $1,061,846. [Record No. 78-2, p. 1]

Jim Aldrich, the Director of the Kentucky TNC chapter at the time of Register's donation, identified the 735 acre farm in Harrison County known as Griffith Woods[2] as "the

---

1    Register conceded in his response to TNC's summary judgment motion that "this case does not present the circumstances for application of *quantum meruit*" and that he would "not contest the entry of summary judgment on that theory of recovery." [Record No. 88, p. 17 n. 4] His claim for *quantum meruit* will be dismissed.

2    Griffith Woods was located on a larger parcel of land known as Silver Lake Farm. For ease of reference herein, Griffith Woods will be used to refer to the property.

best and most [intact] example of a bur oak, blue ash savannah in the inner Bluegrass."

[Record Nos. 78-6, pp. 14; 78-7]  In TNC's real estate abstract, the subject property was described as follows:

> The Licking River Conservation Area Design has identified the 735-acre Hamilton et al. tract as a top acquisition priority.  The tract contains approximately 170 acres of old growth savanna woodlands, and another 200 acres of younger woodlands with excellent restoration potential. Native ground vegetation (including several patches of running buffalo clover, a globally threatened species) has survived on the tract.  The remainder of the tract is used for agricultural purposes, including grazing, haying and row crops.  The tract includes several seasonal streams as well as a permanent stream along its western boundary.  This tract represents the best opportunity to protect and restore a remnant of the Bluegrass Savanna.

[Record No. 78-8, p. 1]  Discussions with Griffith Wood's owners regarding conservation options spanned several years.  During this time, Julian Campbell, Ph.D., a biologist and employee of TNC, took Register and other supporters to visit the property.  [Record No. 78-5, pp. 8–9]  As time progressed, Register told TNC that he wished to focus his efforts with the organization on preserving and managing Griffith Woods.  [Record No. 78-10]

Dr. Campbell indicated in his notes that Register indicated his willingness to donate funds towards the purchase of the land in February 2002.

> Layton has pledged verbally to contribute the approximate sale price of his 120 acre farm on Bryantsville Road in Bourbon Co. . . . . [H]e expects to raise about $1-1.2 million (his purchase price 2-3 years ago was ca. 850K?).  Upon advice of his financial planners, he will give us the equivalent value in appreciated stocks, rather than the farm itself.
> . . .
> Layton's gift is to help with acquisition and management of the ca. 745 acres Silver Lake Farm, which contains the ca. 360 acres designed as the Griffith Woods restoration site.  The total sale price for the site may be about 2-2.5 million, but it is likely that TNC would retain only 25-50% of the farm after reselling portions to partnering agencies and perhaps conservation buyers.
>
> Should some of Layton's gift be freed up after satisfactory resales, he is willing to have this put toward endowment for stewardship at the site.  He is

> also very interested in being actively involved with the farm as a volunteer in the management program, and possibly as a conservation buyer (might there be tax/ethical issues to handle carefully…?). As well as restoring the woodland, he is particularly interested in the plan to develop a native wood plant nursery on the farm. [We have been scheming and dreaming about a nursery with several people, including Doug Hines, who might take early retirement from NRCS to work on it.]

[Record No. 78-9, p. 2] (brackets in original). Dr. Campbell testified that he intended these notes to memorialize Register's intent with respect to his donation and any funds that were liquidated after the contemplated sale of the property. [Record No. 78-5, p. 9–10]

On May 13, 2002, Register wrote a letter to Aldrich, the State Director of TNC, stating:

> I pledge to the Kentucky Chapter of The Nature Conservancy a stock gift equal to the amount of $1,000,000.00 that is to be used for land acquisition. My first preference is for the purchase being negotiated for Griffith Woods. If The Nature Conservancy is unsuccessful in its pursuant of Griffith Woods, the same amount will be made available for another site to be determined.

[Record Nos. 76-19, pp. 2–3; 76-20, p. 2] There was a cover letter with this note, which stated "Jim, Julian wanted a pledge statement for my stock gift. Is this okay (see enclosed)? Or did you want me to sign off on something that you have prepared? If so, just send it to me. Thanks, Layton." [Record No. 78-11, p. 1] Aldrich acknowledged Register's pledge on June 13, 2002, by stating "[o]n behalf of the Trustees and staff of the Kentucky Chapter of The Nature Conservancy, thank you for your **very** generous pledge of $1,000,000.00 (one million dollars) for land acquisition, preferably, Griffith Woods." [Record No. 76-22, p. 2 (emphasis in original)]

At the time of Register's gift, TNC and the University of Kentucky ("UK") were considering a partnership in the Griffith Woods project. Register recalled that TNC was "hoping" that UK would be a partner, but the partnership had not been finalized. [Record

-4-

No. 76-19, p. 8]  UK sought funding from the Kentucky Heritage Land Conservation Fund ("KHLCF") to acquire part of Griffith Woods as part of the partnership with TNC.   [Record No. 76-19, pp. 18–19]  In support of UK's application, Register wrote a letter to KHLCF confirming his commitment and that he had "pledged financially to help the Conservancy acquire the whole farm as a first step to protecting this site from development and ensuring proper management."  [Record No. 76-23, p. 2]  Register further indicated that he was "intending to become the owner of the remainder of the farm that [UK] does not acquire, but the Conservancy will retain a conservation easement."  [Record No. 76-23, p. 2]  Register further indicated that he would "be glad" to "work with [UK] and others to restore the native vegetation and to enhance the value of this farm for conservation in the region."  [Record No. 76-23, p. 2]  Register concluded by offering to donate his pickup truck "for exclusive use" by this project to help with the "initial management" of the property.  [Record No. 76-23, p. 2]

On September 16, 2002, Register wrote to his financial advisor and Aldrich:

I'd like to make now a gift to the Kentucky Chapter of The Nature Conservancy.  I would like the gift to be in the form of stocks adding up to the equivalent of $1 million.  I would prefer that the stocks be sold and the proceeds go toward the establishment and management of a nature preserve in the Bluegrass region, e.g. Griffith Woods.  If the Griffith Woods project falls through, I trust that KNC will put to use the funds in a manner that will further help protect areas in Kentucky with unique and diverse plants and animals.

[Record No. 76-21, p. 2]  Register drafted the language with the assistance of his financial advisor.  [Record No. 76-19, p. 32]  Gifts of stock were made to TNC on September 18, 2002; November 5, 2002; and January 6, 2003.  [Record Nos. 84, pp. 9–10, 15–16; 78-16]  The transfer of stocks on January 6, 2003, was accompanied by a check of $86,000.00.  [Record No. 78-16, p. 1]  Each of the three cover letters from Register's investment clearinghouse to TNC memorializing the transfer of stock stated "[t]his represents a gift from

[Register] to the Nature Conservancy-Kentucky Chapter, Griffith Woods project" or "[t]his represents a gift from [Register] to the Kentucky Chapter Griffith Woods project." [Record No. 78-16]

On November 5, 2002, the owners of Griffith Woods granted TNC an option to purchase the property for $2,004,673.00. [Record Nos. 76-26, p. 2; 76-27] After the transfers from Register, TNC sold the stock for approximately $1,007,410. [Record No. 1-1, p. 3, ¶ 7] Register's donation went towards the purchase of Griffith Woods. The remaining funds for the $2 million purchase were obtained through an internal loan to the Kentucky Chapter from TNC's worldwide office. [Record No. 76-12, p. 9] The property was purchased by TNC through two transactions, the first on December 30, 2002, and the second on January 2, 2003. [Record Nos. 78-6, p. 23–24; 78-8; 78-9]

TNC sold 391 acres of Griffith Woods to the University of Kentucky for $1,120,000.00 on February 26, 2004. [Record No. 76-12, pp. 3–6; 76-13] On the same day, UK conveyed a Deed of Conservation Easement to KHLCF, which restricted use of the property. [Record No. 76-28] TNC retained title to the remaining portion of Griffith Woods.

Unfortunately, the joint venture between TNC and UK did not work as planned. Originally, the conservation efforts at Griffith Woods were to be managed by a consortium of interested parties. [Record No. 84, pp. 35–37] The entities apparently took steps to manage the property, but a comprehensive management plan was never agreed upon. [Record Nos. 84, p. 37; 78-25, p. 2] But despite the lack of a comprehensive management plan, TNC continued its management efforts at the site. Management of the property included prescribed burning, cane restoration, planting native species, such as roughleaf

dogwood, removal of a building, and removal of invasive plants.  [*See* Record No. 76-7, pp. 5–6.]

Aldrich and later Terry Cook[3] continued to correspond with Register about the plans and management at Griffith Woods as the years passed.  At some time, at least in November 2008, Register was told that TNC was exploring options for selling or donating its ownership of Griffith Woods.  [Record No. 78-27]  Register informed Cook that he continued to believe that protecting Griffith Woods was a worthy endeavor.  Register made several suggestions for the property, including donating TNC's interest in Griffith Woods to another entity so that ownership could be centralized and hiring property manager could develop and carry-out a management plan.  [Record Nos. 78-28; 84, pp. 37–41]  Cook notified Register on September 18, 2010, that KDFWR would be making an offer on the portion of Griffith Woods that was still owned by TNC.  [Record No. 76-16, p. 2]  Register responded the next day, indicating that he was hopeful that a deal could be reached.  [Record No. 76-16, p. 2]

On October 17, 2011, TNC sold its interest in the Griffith Woods property to KDFWR for $1,380,760.00.  [Record Nos. 85, pp. 77–79; 78-29]  The property was not placed under a conservation easement as part of the sale.  [Record No. 85, p. 37]  However, TNC notes that other restrictions apply to the use of the Griffith Woods.  [*See* Record No. 76-1, pp. 20–21.]

The parties agree that no portion of Register's donation is currently being used to benefit Griffith Woods.  In sum, TNC invested a total of $2,000,000.00 in the property initially, and subsequently received approximately $2,500,760.00 through the two resales.

---

3       Terry Cook was named as the new Director of the Kentucky TNC chapter in 2008.  [Record No. 78-3, p. 9]

[Record No 78-19, pp. 6–7]  According to Cathy Boyd, the Director of Operations for TNC, Register's original donation was placed in an account to fund the purchase of Griffith Woods and the donation was used for that purpose.  [Record No 78-19, pp. 10–11]  Register's donation was classified as "temporarily restricted" before the donation was used to purchase Griffith Woods.  [Record No 78-19, p. 5]  Later, after Griffith Woods was sold, TNC deposited the funds from the two resales into the same Griffith Woods account, but then transferred money out of the account.  Some of the proceeds from the sale to KDFWR were used to pay-off a land debt on another project.  The rest of the proceeds were deposited into TNC's general operating fund.  [Record No. 78-19, pp. 10–14; *see* Record No. 78-30.]

## II.

Summary judgment is appropriate when there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).  In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

# III.

**1.    By accepting Register's restricted donation, TNC was bound to use the donation for Register's intended purpose.**

The issues before the Court are whether Register provided a conditional gift to TNC and, if so, what are the parameters and duration of those conditions.[4]  TNC argues that the letters from Register do not suffice as written contracts and, therefore, no contract existed.  In the alternative, TNC argues that the gift is subject to strict enforcement of the terms described in Register's September 2002 letter.  Because the donation was used for the purchase of Griffith Woods and the property is protected, TNC argues, the purpose of the gift was satisfied.[5]  It contends that it had no further obligation to use the money toward Griffith Woods following the purchase of the land.  Register agrees that the parties did not enter into a written contract but that the parties are bound by oral agreement.  A precise written agreement is not present here, nor is it required, because Register made a restricted gift to TNC.

Generally, "the *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration."  *United States v. American Bar Endowment*, 477 U.S. 105, 118 (1986).  "Where the gift has passed into the hands of the donee, there is an implied promise agreeing to the purposes for which it is offered from acceptance of the donation and there arises a bilateral contract supported by a valuable consideration."

---

4    Neither party contends that the donation was intended to form a trust.

5    In several points through the briefs on these motions, TNC phrases Register's goal as preservation or protection of the Griffith Woods property.  However, as pointed out by Register, protection is not interchangeable with management in this context.

*Dunaway v. First Presbyterian Church of Wickenburg*, 442 P.2d 93, 95 (1968) (citations omitted).

> In the case of . . . charitable organizations, it may seem obvious that since charitable pledges are often found or deemed to be supported by consideration and therefore legally enforceable, so must the actual donation to the charity. There is support for this proposition, but only in the case . . . where the donor is seeking to enforce a condition in his gift. A promise of a gift is a promise nonetheless, and so is a promise to the donor to abide by a condition in the gift; and the enforcement of promises is the office of contract law. The gift itself is not a promise, however; it is a gift.

*Scholes v. Lehmann*, 56 F.3d 750, 755–56 (7th Cir. 1995) (internal citations omitted). If the gift was not conditioned, then Register's donation was a gift and TNC could do with it what it wished. However, if the donation was restricted, TNC was bound by Register's intention when it accepted the donation. *Dunaway*, 442 P.2d at 96 ("[B]y exercising dominion over the stock, [the church] assented to the conditions of the donation and is bound both in law and in good conscience to perform the conditions or to return the stock and dividends.").

Register intended for the donation to be restricted. *See* 38 Am.Jur.2d Gifts § 67 ("Whether a gift is conditional or absolute is a question of the donor's intent, to be determined from any express declaration by the donor at the time of the making of the gift or from the circumstances."). There is no evidence that Register intended to make a general donation to TNC. Register's testimony, the writings between the parties, the testimony of the other individuals involved and the circumstances surrounding the donation, such as TNC's accounting practices and subsequent restrictions on the funds, support the conclusion that Register's donation was restricted to Griffith Woods as a matter of law. Because TNC accepted the donation knowing that it was to perform certain duties with respect to the

donation, "its acceptance thereof and reliance thereon and promise to carry out the wishes of the donor supply the consideration." Dunaway, 442 P.2d at 95.

Register intended to make a restricted donation, which TNC accepted subject to those conditions, but without the benefit of one integrated document. By accepting the donation with certain restrictions, however, TNC became bound.[6] *Woman's Hospital League v. City of Paducah,* 223 S.W. 159, 160 (Ky. 1920) ("[H]aving accepted the donation with that understanding, the donee and trustee is without power to devote the property to any other use."); *Tennessee Div. of the United Daughters of the Confederacy v. Vanderbilt Univ.*, 174 S.W.3d 98 (2005) ("Because noncompliance results in a forfeiture of the gift, the conditions must be created by express terms or by clear implication and are construed strictly."). A contract which is partly oral and partly in writing is, effectively, an oral contract. *Lyons v. Moise's Ex'r*, 183 S.W.2d. 493, 395 (Ky. 1944). Thus, the Court concludes that the parties entered into an oral contract. *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 105 (Ky. 2003) ("An oral contract is ordinarily no less binding than one reduced to writing.").

Register's letters are consistent with this restriction. The September 16, 2002, letter stated that Register's preference was for the stocks to be sold and the proceeds used for the "establishment and management of a nature preserve in the Bluegrass region, e.g. Griffith Woods." [Record No. 78-12, p. 2] In the alternative, if the Griffith Woods project fell through, Register contemplated freeing the funds to "further help protect" areas in Kentucky. [*Id.*] Register considered an alternative use for the donation because, at the time of the gift, there was no guarantee that TNC would be able to purchase Griffith Woods. But the Griffith

---

6 TNC's policies acknowledge that a donor may restrict a gift through written or oral communications. [Record No. 78-17, pp. 2–6]

Woods project did not fall through. TNC was able to purchase Griffith Woods as contemplated at the time of Register's gift. The only time that any reference was made to using the funds for any purpose other than Griffith Woods was in this limited, alternative statement.

TNC's argues that the May and September 2002 letters merely indicate that Register *preferred* that the donated funds be used for Griffith Woods because the language includes "like" and "prefer." However, the use of precatory language does not control the binding effect of the overall agreement. "[S]uch words as 'wish,' 'request,' 'recommend,' 'desire' are not deemed mandatory unless it appears a legal and enforceable obligation was intended to be created. Unless the context forces the conclusion that the precatory words were used in a stronger sense, they will not be construed as a limitation on the primary estate devised." *Swango v. Swango's Adm'r*, 232 S.W.2d 347, 348 (Ky. 1950). The context provided by the next sentence compels the conclusion that the use of "prefer" is limiting because the next sentence points out what is to happen in the event that Register's first preference is not fulfilled. Thus, an enforceable obligation was intended by Register. Because the next sentence dictates what is to occur if the Griffith Woods project does not materialize, as an alternative, the first sentence is not merely precatory. Thus, the letters are consistent with Register's intended restriction.

Further memorializing Register's intention, the cover letters enclosing the stock gifts to TNC contained language specifying that the funds were to be limited to Griffith Woods. Each letter from Register's investment clearinghouse to TNC stated that the funds represent a gift to "the Nature Conservancy-Kentucky Chapter, Griffith Woods project" or "the

Kentucky Chapter Griffith Woods project." [Record No 78-16] Thus, the cover letter itself notified TNC of Register's purpose for the donation.

Additionally, TNC employees, at the time the gift was made, understood that the gift was restricted. Dr. Julian Campbell, Jim Aldrich, and Donald Logan McCulloch, the Director of Development during the relevant time period, testified that they understood Register's donation was intended to be given for the purpose of Griffith Woods. [Record Nos. 78-5, pp. 11-15, 17-21] Aldrich testified that "[t]here is no doubt in my mind that he did intend for the gift to be used for Griffith Woods. And that's what we used it for." [Record No. 87, p.110] However, Aldrich acknowledged that TNC no longer had any portion of Register's funds invested in Griffith Woods as of the time of his deposition in January 2014. [Record No. 87, p. 111] McCulloch also stated that he understood that "it was a restricted gift and that he gave it because he wanted the conservation project of Griffith Woods to be successful, which entailed . . . buying the land and starting conservation practices there." [Record No. 78-4, p. 3]

Further, TNC initially designated the funds as restricted and continued to treat the funds as restricted in their own internal processes. First, the donation was placed into a restricted account, and deposited back into that account after the sale to KDFWR. [Record No. 78-19, p. 5] Second, the donation was internally classified[7] as restricted. [Record Nos. 78-19, 78-20] Third, Aldrich needed Register's consent to use the donated funds for a

---

7      TNC's "Financial Management Handbook" sets out its internal guideline for classification of donations. [Record No. 78-20] A general gift for land acquisition or stewardship would be designated as "unrestricted." [*Id.*] Contributions "restricted by time or to a specific action or project of the organization" are defined as "temporarily restricted." [*Id.*] In situations where the donation is to be maintained in perpetuity, such as a gift to an endowment, the donations are listed as "permanently restricted." [*Id.*]

particular purpose other than the acquisition of Griffith Woods. [Record No. 78-6, p. 26–26] Fourth, part of the closing checklist before the sale to KDFWR included confirmation that Register was notified of the sale. [Record Nos. 78-36, 78-37]

At the time the donation was made, no one appeared to believe that the funds were not restricted to Griffith Woods. Time has passed, and Register is now faced with a number of TNC employees who were not privy to the discussions at the time of his donation. Nonetheless, they are bound by the restrictions made by Register and accepted by TNC. The recipient of a conditional gift is "not at liberty to ignore or materially modify the expressed purpose underlying the donor's decision to give." *Adler v. Save*, 74 A.3d 41, 42 (Sup. Ct. N.J. App. Div. 2013). This is true even if the conditions at the time of the gift have materially changed, "making the fulfillment of the donor's condition either impossible or highly impractical." *Adler*, 74 A.3d at 42. The Court is "not at liberty to relieve the parties from contractual obligations simply because these obligations later prove to be burdensome or unwise . . . ." *Vanderbilt*, 174 S.W.2d at 118.

**2. Factual issues remain regarding whether TNC's use of the donation complies with Register's intent.**

The Court must look to the facts and circumstances to determine the terms of the oral agreement between the parties. Register's donation was clearly intended for the purpose of Griffith Woods. However, material issues of fact remain regarding whether TNC complied with the terms of the restriction.

On the one hand, Dr. Campbell and Register's testimony indicates that Register considered the possible sale of Griffith Woods and restricted the use of the proceeds to the continued management of the property. Dr. Campbell's testimony and his notes demonstrate

that TNC understood Register's intention that the donation was to continue to be used for management at the site even after the contemplated resales of the property. [Record No. 78-9 ("Should some of [Register's] gift be freed up after satisfactory resales, he is willing to have this put toward endowment for stewardship at the site.")] TNC concedes that Dr. Campbell was Register's primary contact regarding the Griffith Woods property and the donation itself.[8] [Record No. 78-18, p. 2–4] The notes were written in February 2002 (before the donation was made), and they were made for the benefit of TNC to memorialize the donation. [Record No. 78-9] Dr. Campbell testified that Register intended for the proceeds from the sale of Griffith Woods to be used towards stewardship at Griffith Woods, and Campbell's understanding did not change after he wrote his notes. [Record No. 78-5, pp. 9–15, 17–21]

On the other hand, the timing, documents and the conduct of the parties prevent this Court from finding, as a matter of law, that Register's donation was restricted after the sale of the property. For instance, the acknowledgement letter from Aldrich to Register, dated September 20, 2002, states that the contribution will be "applied toward your million dollar pledge for the acquisition of Griffith Woods." [Record No. 93-6, p. 1] However, the State Director's Memo indicates that Register's donation was made for the "acquisition/protection" of Griffith Woods. [Record No. 78-7] Additionally, the parties have established that the Griffith Woods project, and TNC's role in it, changed over the

---

8    McCullough acknowledged that he was not directly involved with Register's donation. [Record No. 78-4, pp. 2–3] Aldrich and Campbell appeared to have communicated most directly with Register regarding the terms and circumstances of his donation. [*Id.*] Nonetheless, TNC attempts to minimize Dr. Campbell's authority to bind TNC as a matter of contract, or question his credibility due to his friendship with Register. Dr. Campbell's authority to bind TNC is not material to this matter because TNC became bound, not by Dr. Campbell's representations to Register, but by TNC's acceptance of the donation, which it knew to be restricted.

course of 2002.  Further, Aldrich's explicitly asked Register in 2003 or 2004, after the purchase of Griffith Woods, whether Register's donation could be diverted for "general operations" related to the Griffith Woods property.  [Record No. 78-6, pp. 25–26]  Register gave his consent.  While Aldrich's request is consistent with an understanding that Register's donation was restricted, the request would not be necessary if the donation was made for the benefit of Griffith Woods rather than the more limited purpose of the purchase of Griffith Woods.

Accordingly, while the Court has determined as a matter of law that the donation was restricted to use for Griffith Woods, whether TNC complied with the terms of the restriction remain for a jury to determine.[9]

### 3.    If the jury determines that TNC violated the conditions of the gift, then Register is entitled to recover his donation.

Should the jury find that TNC breached its contract with Register, reversion is the proper remedy.  *See* 38 Am.Jur.2d Gifts 67 ("[A] donor may revoke the conditional gift if the donee fails or refuses to comply with the conditions imposed by the donor.").  When a donation is made for a specific purpose, and the charitable organization is no longer able or willing to use it for that purpose then reversion to the donor is the proper remedy.  *Women's Hospital League*, 223 S.W. at 160; *McElroy v. Pope*, 154 S.W. 903, 904 (Ky. 1913) ("[I]f a property is donated to a certain charity, it reverts to the donor, when the charitable use to which it is dedicated ceases."); *Grundy v. Neal*, 145 S.W. 401 (Ky. 1912); *see Morrow v. Slaughter*, 68 Ky. 330, 333 (Ky. 1869).  This remedy need not be explicit to be applied. *Grundy*, 145 S.W. at 402–03 ("While the deed contains no provision to the effect that, in the

---

9       TNC also contends that, should it be required to return the gift, there are genuine issues of material fact regarding the amount of Register's donation that was used for Register's intended purpose.

event the property shall cease to be used for the purpose for which it was granted, it shall revert to the grantor, such provision was not necessary . . . .").

If the terms of the restricted donation have been met, then there is no breach and Register is not entitled to recover his donation. If, however, the jury should find that the terms of the gift have not been met, then reversion to Register is the appropriate remedy. Accordingly, summary judgment on Register's breach of contract claim will be denied.

### 4. Estoppel does not bar Register's claim.

TNC argues that Register is estopped from claiming breach of contract because he acquiesced to TNC's sale to KDFWR and subsequent management of Griffith Woods by KDFWR. "A party may be estopped to insist upon a claim or take a position which is inconsistent with an admission or denial of a fact which he has previously made or with a course of conduct in reliance upon which the other party changed his position to his detriment or prejudice." *CSX Transp., Inc. v. First Nat. Bank of Grayson*, 14 S.W.3d 563, 569 (Ky. Ct. App. 1999) (quoting *Hicks v. Combs,* 223 S.W. 2d 379 (Ky. 1949)). TNC's argument fails, however, because the breach of the condition by TNC was not the sale of the property to KDFWR, but the use of the donated funds for a purpose other than Griffith Woods. Thus, Register's knowledge of, or consent to, the sale of Griffith Woods to KDFWR does not bar his claim for breach of contract.

There is no evidence in the record that TNC's plan to use the funds after the sale were disclosed to Register until the sale had already occurred. The first discussion occurred in an e-mail dated December 14, 2011. At that time, Cook outlined several uses, only one of which related to Griffith Woods. [Record No. 76-11, p. 4] No particular amounts were disclosed in the e-mail. TNC continued to represent, in e-mails, dated May 9, 2012 and

October 1, 2012, that other projects were going to be funded at Griffith Woods, even following the transfer, such as funding a conservation manager for the property. [Record Nos. 78-31, 78-33] TNC finally disclosed that it was not using, nor planning to spend, any of the proceeds for the benefit of Griffith Woods in November 2012. [Record Nos. 78-3, pp. 20–23; 78-30] He filed his Complaint several months later. Register is not estopped from contesting TNC's use of the proceeds of the sale under these circumstances.

**5.    Register's claims for unjust enrichment and the application of a constructive trust will be dismissed.**

As an alternative to his breach of contract theory, Register alleges unjust enrichment. *Collins v. Kentucky Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. Ct. App. 2012) ("Unjust enrichment requires: (i) a benefit conferred upon defendant at plaintiff's expense; (ii) a resulting appreciation of benefit by the defendant; and (iii) inequitable retention of benefit without payment for its value."). However, "[u]nder Kentucky law, '[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract.'" *Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) (quoting *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977)). Having found that a contract was formed with respect to the donation at issue, the Court will dismiss Register's unjust enrichment claim.

TNC also moves for summary judgment on Register's claim for imposition of a constructive trust. In Register's response, he argues that constructive trusts are imposed as a remedy for unjust enrichment, and would be available to Register if the Court finds unjust enrichment in this case. However, because the Court concludes that unjust enrichment is not available, the Court will also dismiss Register's claim for constructive trust.

**6. Register has not demonstrated a claim for fraudulent inducement.**

Fraudulent inducement requires proof, by clear and convincing evidence, of: (i) a material representation; (ii) which is false; (iii) which is known to be false or made recklessly; (iv) which is made with inducement to be acted upon; (v) acted in reliance thereon; and (vi) which causes injury. *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (citing *Wahba v. Don Corlette Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. Ct. App. 1978)). Under Kentucky law, "[w]here an individual is induced to enter into the contract in reliance upon false representations, the person may maintain an action for a rescission of the contract, or may affirm the contract and maintain an action for damages suffered on account of the fraud and deceit." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 261 (Ky. Ct. App. 2007) (citing *Bryant v. Troutman*, 287 S.W.2d 918, 920 (Ky. 1956)).

Before Register made his donation, he alleges that he was led to believe that TNC would remain involved in the management of the property even if TNC no longer owned the property. [Record No. 88-4, pp. 2–3] However, discovery in this action revealed documents suggesting that TNC did not, at the time the donation was made, intend to remain part of the management of the property. Thus, Register alleges that he was fraudulently induced to make the donation because TNC had no intention of continuing to be involved in the management of the property after it was sold. A promise to do some act in the future is not an actionable misrepresentation but a promise made without the present intention to perform the act may be actionable. *Schroerlucke v. Hall*, 249 S.W.2d 130, 131 (Ky. 1952); *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 616 (Ky. Ct. App. 2011) ("Since a promise

necessarily carries with it the implied assertion of an intention to perform[,] it follows that a promise made without such intention is fraudulent and actionable in deceit . . . .").

However, Register has not identified any specific misstatement upon which he relied. *See Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). Because of the higher burden of proof required for fraud claims, Register must show evidence that could support a reasonable factfinder in their determination of fraud by the clear and convincing standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–54 (1986). Without an identified, material statement, Register cannot prevail on this claim as a matter of law. As a result, this claim will be dismissed.

**7.      Register has not demonstrated that he may recover under a theory of constructive fraud.**

Register also argues that TNC owed a fiduciary duty to Register and that its violation of that duty constituted constructive fraud. *Wood v. Kirby*, 566 S.W.2d 751, 755 (Ky. 1978) ("Constructive fraud arises through some breach of a legal duty which, irrespective of moral guilt, the law would pronounce fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests."); *Kendrick v. Bailey Vault Co., Inc.*, 944 S.W.2d 147, 150 (Ky. Ct. App. 1997). Register cannot, however, point to any authority in which a Kentucky court has held that a charitable organization has a fiduciary relationship with its donors. The case which Register cites in support of his argument that a fiduciary relationship was created states that the "analytical paradigm" outlined by that court was "consistent with the principles governing a fiduciary relationship" under New Jersey law. *Adler*, 74 A.3d at 55. *Adler* did not address the theory of constructive fraud.

A fiduciary relationship exists "in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). Stated differently, the Supreme Court of Kentucky defines a fiduciary relationship is "one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Id.*; *Quadrille Business Sys. v. Kentucky Cattlemen's Assoc., Inc.*, 242 S.W.3d 359, 364–65 (Ky. Ct. App. 2007). In this case, however, TNC was not acting primarily for Register's benefit, but had promised to act in accordance with Register's intent in making the gift.

Because Kentucky courts have not held that a fiduciary relationship applies to restricted gifts to a charitable organization, and Register has not given the Court any reason to find that a Kentucky court would find that such a relationship existed, or that constructive fraud is an available remedy in this case, the Court declines to extend constructive fraud to apply in this instance. *Blackburn v. Smith*, 33 S.W.2d 336, 337 (Ky. 1930) ("The doctrine of constructive fraud has not been very favorably received.").

## IV.

Based on the foregoing discussion and analysis, it is hereby

**ORDERED** that Defendant The Nature Conservancy's motion for summary judgment [Record No. 76] and Plaintiff Layton Register's motion for partial summary judgment [Record No. 78] are **GRANTED**, in part, and **DENIED**, in part, as set forth more fully herein.

This 9th day of December, 2014.



Signed By:

*__Danny C. Reeves__* DCR

**United States District Judge**